**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Daniel D. Domenico**

Civil Action No. 1:20-cv-00862-DDD-SKC

MICHAEL LAWRENCE,

      Plaintiff,

v.

THE STATE OF COLORADO;
JARED POLIS, Governor of the State of Colorado;
THE COLORADO DEPARTMENT OF PUBLIC HEALTH AND
ENVIRONMENT;
MICHAEL HANCOCK, Denver Mayor; and
THE DENVER DEPARTMENT OF PUBLIC HEALTH AND
ENVIRONMENT,

      Defendants.

---

**ORDER DENYING PLAINTIFF'S REQUEST
FOR PRELIMINARY INJUNCTION**

---

Before the Court is Plaintiff Michael Lawrence's pro se Complaint for Injunctive Relief Pursuant to F.R.C.P. 65 [Doc. 1], in which he seeks to enjoin enforcement of various orders that have been issued by the Defendants[1] in response to the ongoing COVID-19 pandemic. Defendants

---

[1]  For purposes of this Order, the Court will refer to Defendants the State of Colorado, Governor Jared Polis, and the Colorado Department of Public Health and Environment ("CDPHE") collectively as the "State," and to Defendants Mayor Michael Hancock and the Denver Department of Public Health and Environment ("DDPHE") collectively as the "City." To the extent that Plaintiff should have named the City and County of Denver as a defendant in lieu of the DDPHE [*see* City's Resp., Doc. 11 at 1 n.1], the City may file a motion to correct the caption to name the proper entity.

have filed responses opposing the requested preliminary injunction. [City's Resp., Doc. 11; State's Resp., Doc. 12.] Mr. Lawrence has filed a reply. [Reply, Doc. 14.] Defendants have also moved for leave to file a sur-reply brief; the Court grants that motion, and has considered Defendants' sur-reply [Doc. 17-1] and Mr. Lawrence's response to Defendants' motion for leave [Doc. 18] in its evaluation of Mr. Lawrence's preliminary-injunction request. After examining the parties' briefs and the record, the Court has determined that it is unnecessary to hold a preliminary-injunction hearing.[2]

Mr. Lawrence contends that Defendants' public health orders violate his rights under the United States Constitution, and he seeks a blanket injunction prohibiting enforcement of the orders in their entirety. The challenged orders, *inter alia*, restrict public access to numerous facilities, including restaurants; direct Colorado and Denver residents to stay at home except as required to perform certain necessary activities like obtaining food or seeking medical care; and require individuals to maintain a six-foot distance from others if and when they do leave home. Mr. Lawrence says these orders have caused him numerous hardships: his church has ceased conducting in-person Mass, preventing him from

---

[2] Federal Rule of Civil Procedure 65(a) does not explicitly require that a hearing be held on a preliminary-injunction motion, and whether a hearing should be held is a matter for the Court's discretion. *Carbajal v. Warner*, 561 F. App'x 759, 764 (10th Cir. 2014); *see also Reynolds & Reynolds Co. v. Eaves*, 149 F.3d 1191, 1998 WL 339465, at *3 (10th Cir. 1998) (unpublished table decision) (no 10th Cir. authority requires court to hold evidentiary hearing prior to granting or denying preliminary injunction); 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2949 (3d ed.) ("[P]reliminary injunctions are denied without a hearing, despite a request for one by the movant, when the written evidence shows the lack of a right to relief so clearly that receiving further evidence would be . . . pointless."); Local Civ. R. 7.1(h) (motion may be decided without oral argument at court's discretion).

taking Communion; the restaurant where he works as a cook has closed, causing him to lose wages; he has been unable to visit with friends or assemble with others outside his home; and he has been unable to travel in the car that he owns and pays to maintain, license, and insure. These hardships are real and significant. Mr. Lawrence is not alone in his suffering; the restrictions imposed by Defendants' public health orders affect nearly every aspect of Coloradans' lives.

At the same time, the world is in the midst of a pandemic caused by a new virus that spreads easily from person-to-person contact, that health officials believe causes severe illness in roughly 20% of those infected, and for which there is currently no vaccine or antiviral treatment. Much is still unknown about the SARS-CoV-2 virus and the COVID-19 disease. Defendants' orders, while onerous and subject to legitimate debate, represent the reasonable judgment of the Governor, the Denver Mayor, and the respective public health departments of the State and the City, based on the information currently available, as to what measures are necessary to slow the spread of the virus and protect the public health. These are the individuals and entities who have been empowered by the voters of Colorado and their representatives to make such decisions in emergencies. Mr. Lawrence has not made the clear and unequivocal showing required for this Court to enjoin them, so his request for a preliminary injunction is denied.

## BACKGROUND

On March 5, 2020, the first presumptive cases of COVID-19 were identified in Colorado.[3] On March 10, Governor Polis declared an

---

[3]   Press Release, Colo. Governor, *Updated Information on COVID-19* (Mar. 5, 2020), https://www.colorado.gov/governor/news/updated-information-covid-19.

emergency in the state, and on March 12, Mayor Hancock declared a local emergency.[4] [*See* Exec. Order D 2020 003, Ex. A to City's Resp., Doc. 11-1; EOC 100, Ex. B to City's Resp., Doc. 11-2.]

On March 13, Governor Polis "urged—but did not order—the cancellation of all public gatherings in Colorado with more than 250 people, unless events can guarantee six feet of separation between attendees."[5] Following this recommendation by the Governor, the three Catholic dioceses of Colorado made the decision to cancel all public Masses until further notice.[6] That same day, the City canceled public events at certain venues that it owns and operates, including Red Rocks Park & Amphitheatre, the Denver Performing Arts Complex, the Denver Coliseum, the McNichols Civic Center Building, and the Colorado Convention Center.[7]

---

[4]   The federal government has also issued emergency declarations in response to COVID-19. *See* Donald J. Trump, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13, 2020), https://www.whitehouse.gov/pre sidential-actions/proclamation-declaring-national-emergency-concern ing-novel-coronavirus-disease-covid-19-outbreak (public health emergency declared by Secretary of Health and Human Services on Jan. 31, 2020; national emergency beginning Mar. 1, 2020 declared by President Trump on Mar. 13, 2020).

[5]   Jessica Seaman, *Colorado Sees Flood of Event Cancellations as State Reports First Coronavirus Death*, Denver Post, Mar. 13, 2020, https:// www.denverpost.com/2020/03/13/colorado-coronavirus-polis.

[6]   Announcement, Archdiocese of Denver, *Public Masses Cancelled* (Mar. 13, 2020), https://archden.org/coronavirus [hereinafter *Archdiocese Announcement*].

[7]   Press Release, City of Denver, *Public Health Order Announced: City & County of Denver Closes Venues* (Mar. 13, 2020), https://www.denver gov.org/content/denvergov/en/city-of-denver-home/news/2020/city-clo ses-venues.html.

On March 16, the CDPHE issued Public Health Order ("PHO") 20-22, which "closes bars, restaurants, gyms, theaters, casinos, nonessential personal services facilities and horse track and off-track betting facilities to slow the spread of the COVID-19 virus." [PHO 20-22, Ex. 2 to State's Resp., Doc. 12-2 at 2 (as amended Mar. 19, 2020).] PHO 20-22 prohibits restaurants from "offering food or beverage for on-premises consumption," but permits them to offer delivery and pick-up services. [*Id.* at 5.] The DDPHE issued a similar order that same day.[8] PHO 20-22 remains in effect through April 30, 2020, and the DDPHE order remains in effect through May 11, 2020.

On March 18, the CDPHE issued PHO 20-23, which "limit[ed] gatherings of individuals to no more than (10) people to slow the spread of the COVID-19 virus."[9] On March 22, the CDPHE issued PHO 20-24, which directed all Colorado employers, except certain critical businesses, to reduce in-person work by at least 50% and to implement telework or other work-from-home capabilities to the greatest extent possible.[10]

On March 23, the DDPHE issued a "stay-at-home" order for the City, the terms of which have since been amended to be coextensive with the State's stay-at-home order that issued on March 25. [*See* DDPHE Mar. 26 Order, Ex. C to City's Resp., Doc. 11-3.] On March 25, Governor Polis issued an executive order directing all Coloradans to stay at home

---

8   DDPHE Mar. 16 Order, https://www.denvergov.org/content/dam/denvergov/Portals/771/documents/covid-19/public-orders/Public-Health-Order_COVID-19_03162020.pdf.

9   PHO 20-23, https://www.colorado.gov/pacific/sites/default/files/atoms/files/Social%20Distancing%20Public%20Health%20Order.20-23.pdf.

10   PHO 20-24, https://cityofalamosa.org/wp-content/uploads/2020/03/CDPHE-Order-20-24-50-workplace-reduction.pdf.

whenever possible, and directing the CDPHE to issue a public health order defining critical businesses and activities that would be exempt from the stay-at-home directive. [Exec. Order D 2020 017, Ex. D to City's Resp., Doc. 11-4.] Later that day, the CDPHE amended PHO 20-24 to effectuate the stay-at-home mandate and define exceptions as directed by the governor.[11]

The State and City stay-at-home orders require all Colorado residents to stay at home subject to certain limited exceptions. Specifically, the orders direct that:

> A.   All individuals currently living within the State of Colorado are ordered to **Stay at Home whenever possible**. Individuals living in shared or outdoor spaces must at all times, to the greatest extent possible, comply with **Social Distancing Requirements**, and may leave their **Residences** only to perform or utilize **Necessary Activities**.

> B.   All public and private gatherings of any number of people occurring outside a **Residence** are prohibited, except for the limited purposes expressly permitted in this PHO which include Essential Activities. Nothing in this PHO prohibits the gathering of members living in the same **Residence**.

> . . . .

> F.   All travel, including, but not limited to, travel by automobile or public transit, except **Necessary Travel** is prohibited. People must use public transit only for purposes of performing **Necessary Activities** or to travel to and from work to operate **Critical Businesses** or maintain **Critical Governmental Functions**. People riding on public transit must comply with **Social Distancing Requirements** . . . to the greatest extent feasible.

---

[11]  *See* Am. PHO 20-24 (as amended Mar. 25, 2020), https://www.colorado.gov/pacific/sites/default/files/20%2003-25%20Colorado%20Amended%20Public%20HealthOrder2024%20COVID-19.pdf.

[4th Am. PHO 20-24 at 3-4, Ex. 4 to Defs.' Sur-reply, Doc. 17-1 (as amended Apr. 9, 2020).]

The orders define "Necessary Activities" as: (1) activities or tasks essential to the health and safety of individuals, family members, and pets (including, *e.g.*, obtaining medication, walking your dog, obtaining supplies needed to work from home); (2) obtaining food and any services or supplies necessary to maintain the safety, sanitation, and essential operation of a residence; (3) engaging in outdoor activities such as walking, biking, or running that comply with social distancing requirements; (4) performing work for a critical business; and (5) caring for a family member, vulnerable person, or pet in another household. [*Id.* at 5.]

"Necessary Travel" includes travel to access Necessary Activities and Critical Businesses. [*Id.*] Notably, "Critical Businesses" include houses of worship, which "may remain open," but are "encouraged to implement electronic platforms to conduct services whenever possible or to conduct smaller (10 or fewer congregants), more frequent services to allow strict compliance with **Social Distancing Requirements**." [*Id.* at 8.][12]

---

[12]  The Court cites here to the most recently amended version of the State's stay-at-home order, which has been adopted in its entirety by the City, and is the currently operative version of Defendants' orders. The Court also notes for the record that in every amended version of the State's stay-at-home order issued since March 26, 2020, the definition of "Critical Businesses" expressly states that houses of worship may remain open. *See* 2d Am. PHO 20-24 at 8 (as amended Mar. 26, 2020), https://covid19.colorado.gov/sites/covid19/files/Updated%20Public%20 Health%20Order%20-%20Authorized%20Business.32620.pdf [hereinafter 2d Am. PHO 20-24]; [3d Am. PHO 20-24, Ex. E to City's Resp., Doc. 11-5 at 8 (as amended Apr. 1, 2020)]. Likewise, in the first version of the City's stay-at-home order issued on March 23, 2020, "Essential Businesses" were "asked to remain open," and those businesses were defined to include "[f]aith-based establishments and houses of worship," which were "strongly encouraged to implement an electronic platform for services and/or more frequent services with smaller congregations."

"Social Distancing Requirements" means that "individuals shall maintain at least a six-foot distance from other individuals, wash hands with soap and water for at least twenty seconds as frequently as possible or using hand sanitizer, cover coughs or sneezes (into the sleeve or elbow, not hands), regularly clean high-touch surfaces, and not shake hands." [*Id.* at 12.]

The State's stay-at-home order remains in effect through April 26, 2020, and the City's stay-at-home order remains in effect through April 30, 2020. [*Id.* at 13; DDPHE Apr. 6 Order, Ex. F to City's Resp., Doc. 11-6.]

According to the State's Chief Medical Officer, the restrictions and social distancing measures imposed by Defendants' stay-at-home orders are intended to prevent a surge of infected individuals from overwhelming the capacity of the state's healthcare systems. [France Decl., Ex. 1 to State's Resp., Doc. 12-1 at ¶¶ 32-35, 41-42, 44.] But, he says, the impact of Defendants' public health orders is not observable for approximately eight to twelve days after the entry of each order, due to the incubation period of COVID-19 and the time it takes to obtain test results. [France Decl., Doc. 12-1 at ¶ 38.] This means that the impact of the State's and City's stay-at-home orders first became observable last week. [*See id.* at ¶¶ 38-39.] On April 14, state health officials reported that the rate of new cases in Colorado appears to be plateauing.[13] The situation is a fluid one, however, as new information becomes available

---

DDPHE Mar. 23 Order at 4, 9, http://www.denverhousing.org/COVID/Executed-Public-Health-Order-03.23.2020.pdf [hereinafter DDPHE Mar. 23 Order].

[13] Sam Tabachnik, *Colorado's Coronavirus Cases May Be Plateauing, State Health Officials Say*, Denver Post, Apr. 14, 2020, https://www.denverpost.com/2020/04/14/coronavirus-covid-colorado-cases-slowing.

daily.[14] On April 15, Governor Polis reported that "[t]he next roughly five days are going to be critical to understanding how effective [the stay-at-home orders] have been."[15]

## APPLICABLE LAW

### I.   Preliminary Injunction Standard

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule." *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019). One may be granted "only when the movant's right to relief is clear and unequivocal." *McDonnell v. City & Cty. of Denver*, 878 F.3d 1247, 1257 (10th Cir. 2018).

To succeed on a motion for preliminary injunction, the moving party must show: (1) that it is "substantially likely to succeed on the merits"; (2) that it will "suffer irreparable injury" if the court denies the injunction; (3) that its "threatened injury" without the injunction outweighs the opposing party's under the injunction; and (4) that the injunction is not "adverse to the public interest." *Mrs. Fields*, 941 F.3d at 1232; *accord Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The third and fourth preliminary-injunction factors "merge" when the government is the party opposing the injunction. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

---

[14]  *Id.*

[15]  Sam Tabachnik, *Coloradans Should Expect Some Social Distancing for Months to Come, Polis Says*, Denver Post, Apr. 15, 2020, https://www.denverpost.com/2020/04/15/coronavirus-covid-polis-phases-reopening-colorado.

## II.  Constitutional Rights in an Emergency

This case, like many others that have been filed around the country in recent weeks and days, "raises an issue that has long been a source of struggle for the courts: the proper use of the judicial power in reviewing laws and executive orders or actions taken in response to a public health emergency." *S. Wind Women's Ctr. LLC v. Stitt*, No. CIV-20-277-G, 2020 WL 1677094, at *1 (W.D. Okla. Apr. 6, 2020).

States have broad powers to act during an emergency to secure public health and safety. *Jacobson v. Massachusetts*, 197 U.S. 11, 29 (1905). "[T]he rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand." *Id.* Those powers are not unfettered, however. A state may implement measures that curtail constitutional rights during an emergency only "so long as the measures have at least some 'real or substantial relation' to the public health crisis and are not 'beyond all question, a plain, palpable invasion of rights secured by the fundamental law.'" *In re Abbott*, — F.3d —, No. 20-50264, 2020 WL 1685929, at *7 (5th Cir. Apr. 7, 2020) (quoting *Jacobson*, 197 U.S. at 31).

Under this framework, courts may review whether a challenged emergency measure implemented by a state is arbitrary or unreasonable, and whether the measure "lack[s] basic exceptions for 'extreme cases.'" *Id.*; *see also Jacobson*, 197 U.S. at 28, 38-39. But courts must take care not to "second-guess the wisdom or efficacy of the measures." *In re Abbott*, 2020 WL 1685929, at *7 (citing *Jacobson*, 197 U.S. at 28, 30). "It is no part of the function of a court . . . to determine [what is] likely to be the most effective for the protection of the public against disease." *Jacobson*, 197 U.S. at 30. It is, rather, the role of the people's

elected representatives to determine, in light of the available information, the best course to combat a public health threat, and courts must be careful not to usurp that role. *Id.* at 28, 30; *see also Phillips v. City of N.Y.*, 775 F.3d 538, 542 (2d Cir. 2015) (weighing scientific evidence as to societal costs and benefits of public health measures "is a determination for the legislature, not . . . individual objectors"); *Hickox v. Christie*, 205 F. Supp. 3d 579, 592 (D.N.J. 2016) (a public health official's "better-safe-than-sorry determination" is "entitled to deference, absent a 'reliable showing of error'").

The Colorado legislature has delegated to the CDPHE the power and duty to investigate and control the spread of disease during an emergency epidemic. C.R.S. § 25-1.5-102(1)(a)(I), (1)(b)(I)-(II), (1)(c). It has vested in the governor the power and duty to declare such an emergency. C.R.S. § 24-33.5-704(4); C.R.S. § 24-33.5-703(3), (3.5), (4). As a check on the governor's emergency powers, "[t]he general assembly, by joint resolution, may terminate a state of disaster emergency at any time." C.R.S. § 24-33.5-704(4).

The Denver City Council has delegated to the DDPHE the power and duty to prevent the spread of infectious diseases within the city. D.R.M.C. § 24-16(1), (3), (6); *see also* Denver City Charter § 2.12.1(A). And the Denver City Charter vests in the mayor the power to declare a local emergency. *See* Denver City Charter § 2.2.1 ("The Mayor shall be the chief executive . . . ."); C.R.S. § 24-33.5-709(1) (local emergency may be declared by principal executive of state political subdivision).

This Court must take care not to unnecessarily trespass on decisions that are properly within the purview of the State's and City's elected officials, while guarding against any arbitrary or plain and palpable invasion of Mr. Lawrence's constitutional rights.

## DISCUSSION

In his complaint, Mr. Lawrence alleges that he will suffer the follow-ing harms absent a preliminary injunction: he will be unable attend Mass and participate in the Eucharist; he will lose wages; he will be unable to visit with his friends; and he will lose money as he continues to futilely maintain, license, and insure his car. [Compl., Doc. 1 at ¶¶ 19-22.] His complaint does not clearly assert what alleged constitu-tional violations cause each of these harms, but since he is proceeding without an attorney, the Court will liberally construe his pleadings.[16] *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). But the Court cannot assume the role of advocate on his behalf. *Id.* Nor may the Court exempt him from the same rules of procedure that govern other liti-gants. *Green v. Dorrell*, 969 F.2d 915, 917 (10th Cir. 1992).

## I.   Free Exercise of Religion

The main focus of Mr. Lawrence's legal complaints is on his inability to attend Mass in person, and the attendant inability to take Commun-ion and otherwise participate in the ceremonies and communal celebra-tion of his religion. [*See* Reply, Doc. 14 at 4-11.] And indeed, these are probably the most profound of his alleged injuries, and the least amena-ble to remedy through money damages or other compensation. Courts have had to step in to protect the exercise of such sincerely held religious beliefs from government prohibition in other cases, as Mr. Lawrence

---

[16]   The State contends that the courtesy of liberal construction should not apply to Mr. Lawrence, because he was at one time a licensed attor-ney. [State's Resp., Doc. 12 at 10-11 & n.11.] The Court will, however, extend Mr. Lawrence this courtesy, at least for purposes of the present preliminary-injunction request.

notes. *See, e.g.*, *On Fire Christian Ctr., Inc. v. Fischer*, No. 3:20-CV-264-JRW, 2020 WL 1820249 (W.D. Ky. Apr. 11, 2020).

In this case, however, Mr. Lawrence cannot trace his injuries to the orders he challenges. When Colorado's Catholic bishops announced that they were canceling in-person Mass on March 13, Defendants had not yet issued their mandatory stay-at-home orders. And when they did, the orders expressly provided (or in the State's case, were amended within a day of issuance to provide) that houses of worship are critical businesses that may remain open.[17] Mr. Lawrence argues that the orders have had a "chilling effect," such that churches are no longer attempting to hold services for fear of repercussions from the State or City. [Reply, Doc. 14 at 4.] But he has presented no evidence that that is so. And in fact, in announcing the cancellation of public Masses, Archbishop Samuel J. Aquila declared that doing so was a decision he and his fellow bishops reached out of concern for the well-being of their congregants and communities, not out of fear of government punishment.[18] Nor has Mr. Lawrence presented any evidence or reason to believe that if the Court were to enjoin enforcement of the Defendants' orders, his church would begin to offer the public Mass and Eucharist he desires. It appears, rather, from all available evidence, that Catholic churches in

---

[17] *See* 2d Am. PHO 20-24, *supra* note 12, at 8 (as amended Mar. 26, 2020); DDPHE Mar. 23 Order, *supra* note 12, at 4, 9; *see also* [4th Am. PHO 20-24 at 8, Doc. 17-1 (currently operative order, as amended Apr. 9, 2020)].

[18] *See Archdiocese Announcement*, *supra* note 6. According to the Archdiocese, Archbishop Aquila also "has dispensed the Christian faithful in the Archdiocese of Denver from the obligation to participate in the Sunday Eucharist until it is deemed safe for large gatherings of the faithful to congregate." Mark Haas, *What Colorado's 'Stay-at-Home' Order Means for Parishes*, Denver Catholic (Mar. 26, 2020), https://denvercatholic.org/what-colorados-stay-at-home-order-means-for-parishes.

Colorado canceled in-person public Mass because the Church's leadership, based on its own assessment of the dangers of doing so, chose to, not because Defendants have forced them to.

Because the injuries to Mr. Lawrence's religious exercise were not caused by the orders he challenges, and would not be redressed by the injunction he seeks, the Court cannot resolve his free exercise claim. Article III of the Constitution gives federal courts jurisdiction only over actual "cases or controversies," and the Supreme Court has repeatedly made clear that that imposes a minimal constitutional standing requirement on all litigants. Under Article III, a court must "confine[ ] itself to its constitutionally limited role of adjudicating actual and concrete disputes, the resolutions of which have direct consequences on the parties involved." *United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1537 (2018). In order to invoke the court's jurisdiction, a plaintiff must demonstrate, at an "irreducible minimum," that: (1) he has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant; (2) the injury is traceable to the challenged conduct; and (3) the injury is likely to be redressed if the requested relief is granted. *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982).

Here, the injury Mr. Lawrence complains of was not caused by the Defendants' orders, and an injunction against those orders would not force the Church to provide public Mass and Communion. This then does not meet the definition of a concrete case or controversy, and the Court

does not have jurisdiction to address Mr. Lawrence's free exercise claim.[19]

## II.  Existence of an Emergency, the Public Interest, and Balance of Harms

In addition to his free exercise claim, Mr. Lawrence's complaint arguably implicates a number of other constitutional rights. But while it appears he has standing to bring these other claims, they fail for other reasons to satisfy the requirements for a preliminary injunction.

Mr. Lawrence expends great space and energy attempting to explain that the COVID-19 pandemic is not a public health emergency that requires any out-of-the ordinary measures to combat it. [*See* Compl., Doc. 1 at ¶¶ 23-34; Reply, Doc. 14 at 2-3, 11-20.] He cites to evidence and studies, and argues that the mortality rate from COVID-19 is not nearly so high as early data suggest, and that the disease presents no more danger to the public than other common causes of death in the United States like alcoholism, obesity, smoking, or influenza.

Defendants, for their part, have presented testimony from the Chief Medical Officer of the CDPHE that the COVID-19 pandemic constitutes a real public health crisis necessitating a drastic response. [*See* France Decl., Doc. 12-1.] He opines that while about 80% of COVID-19 cases are mild, about 15% are severe, requiring hospitalization, and about 5% are critical, requiring not only hospitalization but also ventilator support. [*Id.* at ¶¶ 7-12.] He states that 70% of patients who require a ventilator

---

[19]  Where the government has actually prohibited activity that a church wishes to undertake, the church, at least, will have standing to challenge that action. *See, e.g.*, *On Fire Christian Ctr.*, 2020 WL 1820249; *Legacy Church, Inc. v. Kunkel*, No. 1:20-cv-00327-JB-SCY (D.N.M. Apr. 17, 2020), ECF No. 29; *First Baptist Church v. Kelly*, No. 6:20-cv-01102-JWB-GEB (D. Kan. Apr. 18, 2020), ECF No. 15.

will not survive. [*Id.* at ¶ 12.] He further opines that COVID-19 is highly contagious, spreading via droplets produced when an infected person coughs or sneezes, and that it can be spread by a person who does not yet (or may never) feel ill. [*Id.* at ¶¶ 19-21.]

There is certainly room for honest debate about many of these issues; in a situation as novel, wide-ranging, and rapidly evolving as this, there are bound to be conflicting opinions, and a stream of updated studies and new facts to assess. It is not the Court's role, however, to resolve these debates. Colorado law gives the Defendants the authority to do that, and the Supreme Court has made clear that, outside of cases that are "beyond all question," courts must defer to those officials' judgment. *Jacobson*, 197 U.S. at 31.

*Jacobson* is both binding and illustrative. There, the Supreme Court upheld a compulsory vaccination law, even though the challenger had presented evidence of opposing theories as to the value and effectiveness of vaccination in preventing the spread of smallpox. 197 U.S. at 30, 34. The Court assumed that when the law in question was passed, the legislature was aware of the opposing theories and "was compelled, of necessity, to choose between them." *Id.* at 30. The Court found that it was not appropriate to second-guess the legislature's choice, given that vaccination as an effective way to combat smallpox was a well-recognized theory, even though "science may yet show it to be wrong." *Id.* at 30-35.

Such is the case here. While Mr. Lawrence has presented an opposing theory regarding whether COVID-19 is a public health emergency, this Court cannot second-guess Defendants' decisions on that basis. COVID-19 has been widely recognized throughout the country and around the world as a threat that must be taken seriously. *See, e.g.*, *In re Abbott*, 2020 WL 1685929, at *8 to *9 (COVID-19 is "a public

health crisis of unprecedented magnitude"; states have been forced to take "numerous drastic measures" that "would be constitutionally intolerable in ordinary times, but are recognized as appropriate and even necessary responses to the present crisis"); *S. Wind Women's Ctr.*, 2020 WL 1677094, at *1 ("There is no dispute that the State of Oklahoma—like governments across the globe—is facing a health crisis in the COVID-19 pandemic that requires, and will continue for an indeterminate time to require, emergency measures."); *On Fire Christian Ctr.*, 2020 WL 1820249, at *4 ("our nation faces a public health emergency caused by the exponential spread of COVID-19" (quoting *In re Abbott*, 2020 WL 1685929, at *2)). Dr. France's opinions are in accord with those of generally respected public health bodies like the United Nations' World Health Organization and the United States' Centers for Disease Control and Prevention.[20]

As in *Jacobson*, science may yet show that the magnitude of the danger posed by COVID-19 is smaller than Defendants and others believe. But nearly every jurisdiction around the country and world has recognized it as a significant danger if left to spread unchecked, and Defendants' assessment of the risks posed by the virus, and the measures they have employed in their orders to slow its spread, are consistent with the

---

[20] *See Q&A on Coronaviruses (COVID-19)*, World Health Org. (Apr. 8, 2020), https://www.who.int/news-room/q-a-detail/q-a-coronaviruses (COVID-19 causes serious illness in 17%-20% of those infected, there is no proven vaccine or treatment, virus spreads through droplets generated when infected person coughs, sneezes, or speaks and can be spread unknowingly by asymptomatic persons); *Coronavirus Disease 2019 (COVID-19): Situation Summary*, Ctrs. for Disease Control & Prevention (Apr. 7, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html (COVID-19 cases range from mild (including asymptomatic) to severe (including death), virus spreads easily from person-to-person).

federal government's guidelines[21] and the actions taken elsewhere throughout this and other countries. The Court cannot say on the record before it that the methods Defendants have chosen to protect the community have "no real or substantial relation" to the public's interest in combatting the spread of COVID-19, nor can the Court substitute its own judgment for that of Defendants "simply because in its . . . opinion" those methods are "perhaps, or possibly[, ]not the best." *See Jacobson*, 197 U.S. at 31, 35.

Given the potentially extreme consequences of failing to contain this virus, and the deference the Court is obligated under *Jacobson* to give to the elected branches on such matters, there can be no doubt that the harm caused by an erroneous injunction would be severe.

Against this, Mr. Lawrence does not dispute that COVID-19 is a pandemic [Reply, Doc. 14 at 7], or that it has caused a significant number of infections and deaths around the world [*id.* at 15-16, 18-19]. But he argues that Defendants' response to the COVID-19 threat "is far more costly than the problem it seeks to solve," citing the harm to the economy and attendant ripple effects he alleges will occur if Defendants' orders are allowed to persist. [Compl., Doc. 1 at ¶¶ 38-42; *see also* Reply, Doc. 14 at 22-24 (arguing that saving "a handful of lives" does not outweigh the "staggering" cost of "destroying the economy").] On the other hand, he contends, there is little harm in enjoining the orders, because Coloradans can be trusted to "do the right thing," *i.e.*, to voluntarily comply with social distancing recommendations in the absence of an order mandating such compliance. [Compl., Doc. 1 at ¶¶ 43-45.] But

---

[21] *See* Ctrs. for Disease Control & Prevention, *The President's Coronavirus Guidelines for America* (Mar. 16, 2020), https://www.whitehouse. gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x 11_315PM.pdf.

Mr. Lawrence's argument that people can be trusted to voluntarily stay at home and comply with social distancing guidelines in the absence of an order requiring them to do so is belied by the very relief he seeks—he wants to enjoin the orders so that he doesn't have to comply with them. Indeed, even with the orders in place, the City had already issued nearly 1,800 warnings for violations of the stay-at-home mandate as of April 6, 2020.[22]

What is more, Mr. Lawrence seeks a sweeping injunction that bars enforcement of Defendants' orders in their entirety, rather than discrete aspects of the orders, such as those challenged in cases like *South Wind Women's Center*, *On Fire Christian Center*, or *First Baptist Church v. Kelly*. Defendants have presented evidence that without these public health orders in place, the SARS-CoV-2 virus will spread more rapidly, threatening to overwhelm Colorado's hospitals, and causing a greater number of deaths from COVID-19. [*See* France Decl., Doc. 12-1 at ¶¶ 31-43.] They have also presented evidence that the COVID-19 pandemic itself will cause adverse economic consequences with or without social distancing interventions, and that the measures implemented by their orders may, ultimately, lessen the degree of economic harm.[23]

---

[22]  Press Release, City of Denver, *Denver Extends Stay at Home Order, City Continues Outreach and Enforcement* (Apr. 6, 2020), https://www.denvergov.org/content/denvergov/en/mayors-office/newsroom/2020/denver-extends-stay-at-home-order.html.

[23]  *See* Sergio Correia et al., *Pandemics Depress the Economy, Public Health Interventions Do Not: Evidence from the 1918 Flu* (Working Draft, Apr. 10, 2020), https://ssrn.com/abstract=3561560 (follow link to PDF); Henry M. Paulson, Jr. et al., *Economic Strategy Group Statement on COVID-19 Pandemic and Economic Crisis* (Mar. 25, 2020), https://economicstrategygroup.org/resource/economic-strategy-group-statement-covid19.

The State and City have a compelling interest in maintaining the health and safety of their residents, as Mr. Lawrence concedes. [Reply, Doc. 14 at 6, 7.] He disagrees with how they are going about it, as is his right. But the Defendants—not Mr. Lawrence, and not this Court—are charged with assessing the risks and attempting to implement the policies that best balance the costs and benefits of these difficult choices. Defendants' choices may turn out to be wrong, in which case a lawsuit on the merits may succeed. But for purposes of a preliminary injunction, the possibility that those choices may yet be shown to be wrong is not enough. While compliance with the challenged public health orders is painful for Mr. Lawrence and many others, he has not made a clear and unequivocal showing that the balance of harms tips in his favor, or that enjoining enforcement of the orders is in the public interest.

## III. Likelihood of Success on the Merits

Failure to establish that the public interest and balance of harms are in his favor is itself enough to defeat Mr. Lawrence's effort to enjoin Defendants' orders. *See Winter*, 555 U.S. at 23 ("A proper consideration of these factors alone requires denial of the requested injunctive relief."). But Mr. Lawrence also has not shown at this stage that he is likely to succeed on the merits of his claims. To do so, he must be able to establish that Defendants' public health orders (1) lack a "real or substantial relation" to the public interest in combatting the COVID-19 pandemic; or (2) are "beyond all question, a plain, palpable invasion" of his constitutional rights. *In re Abbott*, 2020 WL 1685929, at *8 (citing *Jacobson*, 197 U.S. at 31).

Defendants are correct that Mr. Lawrence's motion and briefing have not been especially clear about which particular constitutional provisions, other than the Free Exercise Clause, he alleges are violated by

Defendants' orders. But construing his pleadings liberally in light of his pro se status, the Court has found at least three potential claims in his motion: a takings claim, a right to association and/or travel for social reasons, and an equal protection claim. Mr. Lawrence has not demonstrated a substantial likelihood of success on the merits of any of these claims.

Defendants may overstate their case a bit when they suggest that there can *never* be a takings claim under the Fifth Amendment when the government takes action through its police power rather than the power of eminent domain. *See, e.g.*, *Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992). But they are quite likely correct that temporary moratoria on various business activities, including those of Mr. Lawrence's employer, are not compensable takings (particularly to an employee, rather than the business owner). *See Friends of Danny DeVito v. Wolf*, — A.3d —, No. 68 MM 2020, 2020 WL 1847100 (Pa. Apr. 13, 2020). And to the extent Mr. Lawrence's lost wages and sunk vehicle expenses have resulted from an unconstitutional taking in violation of the Fifth Amendment, those harms are compensable with money damages and thus are not irreparable. This claim therefore does not justify a preliminary injunction.

As to visits with friends, the Court is again inclined to think that Defendants underestimate the potential constitutional implications of a stay-at-home order. Surely, say, a permanent ban on social visits or travel would warrant close judicial scrutiny. Nevertheless, Mr. Lawrence has not shown that being denied such visits under the present circumstances constitutes a plain and palpable deprivation of any recognized constitutional right. *See City of Dallas v. Stanglin*, 490 U.S. 19, 25 (no general constitutional right of social association); *Zemel*

*v. Rusk*, 381 U.S. 1, 15-16 (1965) (right to travel may be restricted where necessary to protect area from disease).[24]

Mr. Lawrence likens Defendants' orders here to the internment of Japanese Americans during World War II. [Compl. Doc. 1 at ¶¶ 35-26.] He also suggests that Defendants' orders create arbitrary and improper distinctions among "Critical Businesses" by, *e.g.*, allowing liquor stores and marijuana dispensaries to remain open while, *e.g.*, requiring restaurants to close. [*See* Reply, Doc. 14 at 21-22.] To the extent Mr. Lawrence is raising a challenge under the Equal Protection Clause of the Fourteenth Amendment, he is not likely to succeed. Defendants' orders here, while onerous, are hardly akin to the internment of a group of citizens based on race or national origin. Most obviously, the orders are generally applicable, and not directed at any protected class. *See Price-Cornelison v. Brooks*, 524 F.3d 1103, 1110 (2008) (rational-basis scrutiny applies to state action that does not target protected class or burden exercise of fundamental right). Mr. Lawrence has made no showing that others similarly situated are treated differently from him. *See id.* at 1109 (equal protection "is essentially a direction that all persons similarly situated should be treated alike"). Without that minimum showing, he does not have a likelihood of success on any equal protection claim.

---

[24] *See also* Eugene Volokh, *Liberty of Movement and Assembly*, Volokh Conspiracy (Apr. 4, 2020, 5:39 PM), https://reason.com/2020/04/04/liberty-of-movement-and-assembly ("[T]he normal conditions that justify liberty of movement and travel—that make this liberty consistent with the libertarian judgments that each of us should have the right to do things that don't physically harm others—are regrettably not present when each of us (with no conscious choice on our parts) is potentially highly lethal to people around us. However peaceable we might be in our intentions, our assembling is a physical threat.").

Mr. Lawrence also generally contends that Defendants' public health orders are not narrowly tailored to their purported objective. [Reply, Doc. 14 at 21-23.] Under *Jacobson*, though, the Court cannot demand such narrow tailoring as Mr. Lawrence demands. "[S]o long as the measures have at least some 'real or substantial relation' to the public health crisis and are not 'beyond all question, a plain, palpable invasion of rights secured by the fundamental law,'" the Court may not intervene. *In re Abbott*, 2020 WL 1685929, at *7 (quoting *Jacobson*, 197 U.S. at 31). Unless a particular provision of Defendants' orders is arbitrary or imposes a plain and palpable invasion of constitutional rights, the Court cannot substitute its, or Mr. Lawrence's, preferred policies.[25]

Some state and local officials elsewhere have elected to impose somewhat less stringent proscriptions on public activity, while others seem to have gone to the other extreme. Defendants here appear to have made

---

[25] Mr. Lawrence, in response to Defendants' sur-reply, also argues that Governor Polis has usurped the legislative function in issuing the State's orders. [Resp. to Defs.' Mot. for Leave, Doc. 18 at 3.] "Not since the time of King James I has one seen such despotism," he asserts. [*Id.*] Given that since King James's reign the world has seen King George III, the faults of whom are famously chronicled in the Declaration of Independence and led to the Revolutionary War, and the despotisms of Mao, Stalin, and Hitler, to name a few, this is a serious charge indeed. But whatever its factual basis, this argument is not likely to succeed as a legal matter. As explained above, the governor is explicitly given the discretion by laws enacted by the Colorado General Assembly to declare emergencies and enter orders like those at issue here. That the legislature is adjourned at the moment does not change the fact of those pre-existing authorizations. And, contrary to Mr. Lawrence's assertion, the legislature has not been ordered to stay home. *See* [4th Am. PHO 20-24 at 11, Doc. 17-1 (state and local legislative functions shall continue)]; Alex Burness, *Colorado Legislature Shuts Down Amid Coronavirus Outbreak*, Denver Post, Mar. 14, 2020, https://www.denverpost.com/2020/03/14/colorado-legislature-shutdown-coronavirus-covid19 (General Assembly voted to shut itself down over a week before Defendants' stay-at-home orders issued).

relatively careful efforts to limit their mandatory orders to those necessary to address the public health demands of the pandemic while also permitting Coloradans to maintain what freedoms are possible under the circumstances. No doubt the lines they have drawn are imperfect, and the Court notes that the ever-changing facts surrounding this pandemic do require the Defendants to continually update their assessments and policies. But ultimately, the Constitution places the primary responsibility for making such choices in the democratic branches of the several states. The people of Colorado have given that power and responsibility to the Defendants. Precedent constrains the federal judicial branch to a limited role in second-guessing their choices, particularly when the plaintiff is seeking the extraordinary remedy of a broad preliminary injunction. That does not mean the Constitution provides no protections for abuse of these powers, of course. But the Framers understood that the primary protection against the abuses Mr. Lawrence fears is generally not litigation, but rather in the Constitution's structural mandates, particularly regular elections and federalism. States and localities around the country are grappling with this pandemic, and the genius of our system of government is that it allows them to take different approaches, serving as the "laboratories of democracy" where various approaches will be tested. *See New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting).

The Court has true sympathy for the financial and other hardships this pandemic and the attendant public health orders are causing Mr. Lawrence and many others. Mr. Lawrence would choose a different course than that chosen by Defendants. But Defendants are the ones who have been selected by Colorado's voters to make that choice, and the facts do not show that Defendants' orders are the sort of plain and palpable violation of Mr. Lawrence's constitutional rights that would

justify judicial intervention in the form of a preliminary injunction. The Court must therefore deny his request.

## CONCLUSION

Because Mr. Lawrence has not made the showing necessary to justify a preliminary injunction, the Court finds that he is not entitled to the extraordinary relief that he seeks. It is therefore ORDERED that Plaintiff Michael Lawrence's request for entry of a preliminary injunction is DENIED.

It is FURTHER ORDERED that:

Defendant City and County of Denver's Motion to Dismiss [Doc. 11] is DENIED WITHOUT PREJUDICE. *See* Local Civ. R. 7.1(d) ("A motion shall not be included in a response or reply to the original motion. A motion shall be filed as a separate document.");

Defendants' Joint Motion for Leave to File Surreply in Opposition to Preliminary Injunction [Doc. 17] is GRANTED; and

Defendants shall answer or otherwise respond to Plaintiff's complaint within the time limits prescribed by the Federal Rules of Civil Procedure and the Local Civil Rules of the United States District Court for the District of Colorado.

DATED: April 19, 2020          BY THE COURT:

_____

Hon. Daniel D. Domenico