IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Daniel D. Domenico**

Civil Action No. 1:20-cv-00862-DDD-SKC

MICHAEL LAWRENCE,

     Plaintiff,

v.

JARED POLIS, Governor of the State of Colorado;
JILL RYAN, Executive Director of the Colorado Department of Public Health and Environment;
MICHAEL HANCOCK, Denver Mayor; and
BOB MCDONALD, Executive Director of the Denver Department of Public Health and Environment,

     Defendants.

---

**ORDER GRANTING MOTIONS TO DISMISS
AND DENYING PLAINTIFF'S SECOND MOTION
FOR PRELIMINARY INJUNCTION**

---

Pro se Plaintiff Michael Lawrence brings claims alleging that various public-health orders issued by Colorado and Denver officials[1] in response to the ongoing COVID-19 pandemic violate the United States Constitution, the Colorado Constitution, Colorado statute, and the Denver Municipal Code. He seeks money damages and preliminary and permanent injunctions prohibiting enforcement of Defendants' orders in their entirety. Defendants oppose the pending motion for preliminary

---

[1]   For purposes of this Order, the court refers to Defendants Jared Polis and Jill Ryan collectively as the "State" or "State Defendants," and to Defendants Michael Hancock and Bob McDonald collectively as the "City" or "City Defendants."

injunction and have moved to dismiss Mr. Lawrence's complaint. Defendants' motions are granted, Mr. Lawrence's claims are dismissed, and his motion for a preliminary injunction is denied.

## PROCEDURAL HISTORY

On March 30, 2020, Mr. Lawrence filed his original complaint in this action against the State of Colorado, Governor Jared Polis, the Colorado Department of Public Health and Environment, the Denver Department of Public Health and Environment, and Denver Mayor Michael Hancock. [Compl., Doc. 1.] Mr. Lawrence alleged that the public-health orders Defendants had issued to curb the spread of COVID-19 violated his rights under the United States Constitution, and he sought to preliminarily enjoin enforcement of the orders that were in effect at that time. [*See id.*] The court denied Mr. Lawrence's first request for a preliminary injunction. [Order Denying 1st Req. for Prelim. Inj., Doc. 19.]

Since that time, Mr. Lawrence has amended his complaint twice. [*See* 1st Am. Compl., Doc. 23; 2d Am. Compl., Doc. 59.] Mr. Lawrence no longer alleges claims against the State of Colorado or the state and city health departments. He has added as defendants Jill Ryan and Bob McDonald, the executive directors of the state and city health departments, respectively. [*See* 2d Am. Compl., Doc. 59.] In addition to his claims under the federal Constitution, Mr. Lawrence now also alleges that Defendants' public-health orders violate the Colorado Constitution, Colorado statute, and the Denver Municipal Code. [*See id.*] He has also filed a second motion for a preliminary injunction based primarily on his contention that the COVID-19 pandemic no longer constitutes a public-health emergency, to the extent it ever did. [*See* 2d Mot. for Prelim. Inj., Doc. 46.]

Defendants move to dismiss Mr. Lawrence's Second Amended Complaint, contending, among other things, that Mr. Lawrence lacks standing to bring many of his claims, that the complaint does not state plausible legal claims, and that Defendants are entitled to qualified immunity from many of the asserted claims. [*See* City's Mot. to Dismiss, Doc. 61; State's Mot. to Dismiss, Doc. 63.]

After examining the parties' briefs and the record, the court has determined that it is unnecessary to hold a hearing on the pending motions.

## FACTUAL BACKGROUND

On March 5, 2020, the first presumptive cases of COVID-19 were identified in Colorado.[2] On March 10, Governor Polis declared an emergency in the State, and on March 12, Mayor Hancock declared a local emergency in the City.[3] [*See* Exec. Order D 2020 003, Doc. 11-1; EOC 100, Doc. 11-2.] These emergency declarations have since been extended numerous times, and Governor Polis, Director Ryan, and Director McDonald have issued a series of executive orders and public-health orders to slow the spread of COVID-19 in Colorado and Denver.

---

[2]   Press Release, Colo. Governor, *Updated Information on COVID-19*, Colo. Off. State Web Portal (Mar. 5, 2020), https://www.colorado.gov/governor/news/updated-information-covid-19.

[3]   The federal government has also issued emergency declarations in response to COVID-19. *See* Donald J. Trump, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak (public health emergency declared by Secretary of Health and Human Services on Jan. 31, 2020; national emergency beginning Mar. 1, 2020 declared by President Trump on Mar. 13, 2020).

When Mr. Lawrence filed his original complaint in March, Governor Polis had issued Executive Order D 2020 017, which directed implementation of a set of protective measures dubbed "Stay at Home." [*See* Order Denying 1st Req. for Prelim. Inj., Doc. 19 at 5-8.] Governor Polis later issued Executive Orders D 2020 044 and D 2020 091, dubbed "Safer at Home," and Executive Order D 2020 127, dubbed "Protect Our Neighbors." The Safer at Home and Protect Our Neighbors orders eased some of the previous Stay at Home restrictions, depending on the COVID-19 case metrics within individual Colorado communities. Director Ryan and the City issued corresponding public-health orders implementing the restrictions directed by the Governor's executive orders. When Mr. Lawrence's Second Amended Complaint was filed, Denver was subject to the Safer at Home set of restrictions.

Since that time, Governor Polis issued Executive Order D 2020 235, which directs that his previous Stay at Home, Safer at Home, and Protect Our Neighbors orders be combined and harmonized into a single "COVID-19 Dial" framework. Director Ryan issued, and the City adopted, Public Health Order 20-36, which implements this COVID-19 Dial. Denver's COVID-19 metrics currently place the City under the "Level Red: Severe Risk" set of restrictions in Public Health Order 20-36. The City has also imposed additional restrictions beyond those set forth in the State's orders.

Defendants have routinely updated and amended their public-health orders as new information about the SARS-CoV-2 virus and the COVID-19 disease becomes available, and as infection rates fluctuate in

Denver and throughout the State.[4] These frequent updates present the court and Mr. Lawrence with a moving target. Mr. Lawrence's Second Amended Complaint references only Defendants' public-health orders issued back in March and April, including the now-expired Stay at Home orders. [*See* 2d Am. Compl., Doc. 59 at ¶¶ 12-19.] The complaint does, however, note that "defendants' orders . . . have recently eased up a little," which the court interprets as a reference to the Safer at Home orders that were in effect at the time the complaint was filed.[5] [*Id.* at ¶ 22.] Those orders have now been superseded by the COVID-19 Dial orders.

For purposes of assessing the pending motions, the court will consider the public-health orders that are currently in effect: (1) Governor Polis's Executive Order D 2020 265[6] and Director Ryan's Public Health Order 20-36;[7] and (2) the City's December 1, 2020 public-health order.[8] The "Level Purple: Extreme Risk" set of restrictions in Public Health Order 20-36 is similar to the restrictions imposed by the Stay at Home

---

[4]   *See generally* CDPHE, *All Public Health & Executive Orders*, Colo. COVID-19 Updates, https://covid19.colorado.gov/prepare-protect-your self/prevent-the-spread/public-health-executive-orders (last visited Dec. 4, 2020); City & Cnty. of Denver, *Public Orders*, COVID-19 Information, https://www.denvergov.org/content/denvergov/en/covid-19/pub lic-orders.html (last visited Dec. 4, 2020).

[5]   Because Mr. Lawrence is proceeding without an attorney, the court must liberally construe his pleadings, without assuming the role of advocate on his behalf. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

[6]   EO D 2020 265 (Nov. 28, 2020), https://drive.google.com/file/d/1y JahkEWs-q7dVpmQkbWWgoQrboYVLPJs/view (amending and extending COVID-19 Dial Executive Order D 2020 235).

[7]   2d Am. PHO 20-36 (Nov. 20, 2020), https://drive.google.com/file/d/ 1tuesNFfblAKcw62ao-fALbBxSUC0gccP/view.

[8]   DDPHE Order (Dec. 1, 2020), https://www.denvergov.org/content/ dam/denvergov/Portals/covid19/documents/home-by-10-public-health-order.pdf.

orders that are explicitly referenced in the Second Amended Complaint. *Compare* [4th Am. PHO 20-24 (Apr. 9, 2020), Doc. 61-2], *with* 2d. Am. PHO 20-36, *supra* note 7, § II(G). And the restrictions imposed at Levels Blue through Red in Public Health Order 20-36 are similar to the restrictions imposed by the Safer at Home orders that were in effect at the time the Second Amended Complaint was filed and that are implicitly referenced in the complaint. *Compare* [8th Am. PHO 20-28 (June 30, 2020), Doc. 51-2], *with* 2d Am. PHO 20-36, *supra* note 7, §§ II(C)-(F). The differences between the previous Stay at Home and Safer at Home orders and their counterparts in the currently operative COVID-19 Dial orders do not materially affect the court's analysis of the issued raised in Defendants' motions to dismiss or Mr. Lawrence's motion for a preliminary injunction.

Although the particulars of Defendants' previous and currently operative public-health orders are not identical, each set of orders has included the type of restrictions that Mr. Lawrence primarily takes issue with in his Second Amended Complaint: occupancy limitations and other restrictions on restaurants' operation. At the currently operative Level Red of the COVID-19 Dial, the State's orders limit restaurants to outdoor in-person dining, along with curbside, takeout, and delivery services. 2d Am. PHO 20-36, *supra* note 7, § II(F)(2)(h). Outdoor in-person dining is restricted to groups of people from the same household spaced at tables six feet apart. *Id.* Alcohol sales must stop at 8:00 p.m. for on-premises consumption, and at 10:00 p.m. for takeout and delivery services. *Id.* The currently operative City order adopts the State's restrictions and imposes additional restrictions that are not pertinent to the motions at issue. DDPHE Order, *supra* note 8. Mr. Lawrence alleges that the restaurant where he works has closed because it cannot be profitable under the restrictions imposed by Defendants, thus depriving him

of the ability to work and causing him to lose wages. [2d Am. Compl., Doc. 59 at ¶¶ 20-22, 24.]

## MOTIONS TO DISMISS

## I.  Applicable Law

### A.  Motion to Dismiss Standards

Defendants move to dismiss Mr. Lawrence's claims pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction, and pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

The court has subject-matter jurisdiction only over actual "cases or controversies." *See* U.S. Const. art. III, § 2. The Supreme Court has made clear that this imposes a standing requirement on all litigants. In order to have standing to bring his claims, Mr. Lawrence must show that: (1) he has suffered some actual or threatened injury as a result of Defendants' public-health orders; (2) the injury is traceable to those orders; and (3) the injury is likely to be redressed if his requested relief is granted. *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982). Subject-matter jurisdiction does not exist in the absence of constitutional standing. It is Mr. Lawrence's burden to allege sufficient facts to show subject-matter jurisdiction; "[i]f [he] fai[ls] to make the necessary allegations, [he has] no standing." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990).

If the court has subject-matter jurisdiction, Mr. Lawrence must state plausible claims for relief in order to avoid dismissal. In reviewing the sufficiency of Mr. Lawrence's claims, the court must determine whether the factual allegations in the Second Amended Complaint, accepted as

true, support a reasonable inference that Defendants are liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-57 (2007). The court must construe the alleged facts in the light most favorable to Mr. Lawrence. *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007). And while the court typically may not look beyond a complaint when deciding whether it states plausible claims, the court can take judicial notice of government documents such as the public-health orders at issue here, and may consider documents referred to in the complaint if those documents are central to the plaintiff's claim and the parties do not dispute their authenticity. *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010).

## B.  Constitutional Rights and Public Health

As this court has recognized in this case and elsewhere, local governments have broad powers to act during an emergency to secure public health and safety. *See Jacobson v. Massachusetts*, 197 U.S. 11, 29 (1905). Beyond that generality, however, this case and many others occasioned by the ongoing pandemic show that there is significant disagreement about just how far the *Jacobson* case allows state and local governments to go. In *Jacobson*, the Supreme Court rejected a challenge to a mandatory vaccination law, holding that when a state enacts emergency measures to protect public health, those measures may permissibly restrict individual liberties so long as they have some "real or substantial relation" to the public health crisis and are not "beyond all question, a plain, palpable invasion of rights secured by the" Constitution. *Id.* at 31, 38.

According to Defendants, the import of *Jacobson* is that "[d]uring a public health emergency, the traditional tiers of constitutional scrutiny do not apply," and courts may overturn state or local public-health

measures only if they are arbitrary or a plain and palpable invasion of constitutional rights. [State's Resp. to 2d Mot. for Prelim. Inj., Doc. 52 at 7; *see also* City's Mot. to Dismiss, Doc. 61 at 3; State's Mot. to Dismiss, Doc. 63 at 6-7.] Like many litigants and a number of courts that have adopted it, Defendants' position is based in part on the Supreme Court's decision in *South Bay United Pentecostal Church v. Newsom*, in which the Court declined to grant injunctive relief from COVID-19 restrictions where that relief had been withheld by lower courts. 140 S. Ct. 1613 (2020) (mem.). But as this court recently explained, this position is an unnecessary and incorrect expansion of what the Supreme Court has actually said. *Denver Bible Church v. Azar*, No. 1:20-cv-02362-DDD-NRN, 2020 WL 6128994, at *5 to *8 (D. Colo. Oct. 15, 2020). *Jacobson* does not mean that ordinary constitutional review of state action is suspended when that action is taken in response to a pandemic or other public-health emergency; *Jacobson* instead fits within the constitutional doctrine that has been developed in the 115 years since its issuance. *Id.*; *Roman Catholic Diocese of Brooklyn v. Cuomo*, — S. Ct. —, No. 20A87, 2020 WL 6948354, at *5 to *6 (2020) (Gorsuch, J., concurring); *accord Bayley's Campground Inc. v. Mills*, 463 F. Supp. 3d 22, 30-32 (D. Me. 2020); *Cnty. of Butler v. Wolf*, — F. Supp. 3d —, No. 2:20-CV-677, 2020 WL 5510690, at *5 to *10 (W.D. Pa. Sept. 14, 2020).[9]

---

[9]   *See also, e.g.*, *League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, 814 F. App'x 125, 126-27 (6th Cir. 2020) (some COVID-19 public-health orders "involve individual rights for which precedent requires courts to apply a heightened level of scrutiny to government actions . . . . [b]ut many other cases involve executive actions that . . . are viewed only through the lens of a very modest, or 'rational basis' . . . review"); *Baptiste v. Kennealy*, — F. Supp. 3d —, No. 1:20-cv-11335-MLW, 2020 WL 5751572, at *4, *6 to *8 (D. Mass. Sept. 25, 2020) (applying rational-basis review to contracts and takings claims challenging state legislature's COVID-19 act, and intermediate scrutiny to free speech claim).

Indeed, *Jacobson* itself prescribes that no rule or regulation enacted by a state or local government to safeguard public health may "contravene the Constitution of the United States, nor infringe any right granted or secured by that instrument." 197 U.S. at 25. "A local enactment or regulation, even if based on the acknowledged police powers of a state, *must always yield* in case of conflict . . . with any right [the Constitution] gives or secures." *Id.* (emphasis added). The Constitution and the rights it protects are no less important, and the judicial branch should be no less vigilant in enforcing those rights, simply because the government is responding to an emergency. *See Brooklyn*, 2020 WL 6948354, at *3 (per curiam) ("[E]ven in a pandemic, the Constitution cannot be put away and forgotten.").

And in fact, the Supreme Court recently did enjoin enforcement of state-ordered restrictions issued in response to the COVID-19 pandemic, applying traditional constitutional review to a free exercise challenge under the First Amendment. *Id.* at *1 to *2. This is notable first because the Supreme Court is doubly reluctant to grant injunctive relief when it has been denied below. *Respect Maine PAC v. McKee*, 562 U.S. 996 (2010) (mem.). Second, and perhaps more to the point here, while Chief Justice Roberts would not have issued the injunction because the defendant governor lifted the restrictions at issue after the plaintiffs filed their injunction application, he clarified that his concurrence in *South Bay* should not be overread: "*Jacobson* . . . warranted exactly one sentence in *South Bay*. What did that one sentence say? Only that [o]ur Constitution principally entrusts [t]he safety and the health of the people to the politically accountable officials of the States to guard and protect." *Brooklyn*, 2020 WL 6948354, at *9 (Roberts, C.J., dissenting) (internal quotation marks omitted). This is, as the Chief Justice notes, fully consistent with traditional constitutional analysis, and, so long as one

does not "reach beyond the words themselves" to find an exception to ordinary constitutional review, "should be uncontroversial." *Id.*

Mr. Lawrence, for his part, contends that the COVID-19 pandemic no longer constitutes an "emergency" justifying extraordinary government powers, to the extent it ever did. [*See* 2d Am. Compl., Doc. 59 at ¶¶ 11, 77-81, 95, 97-99; *see also* Mot. for Prelim. Inj., Doc. 46 at 1-8; Reply to State's Resp. to Mot. for Prelim. Inj., Doc. 54 at 1-2, 7; Reply to City's Resp. to Mot. for Prelim. Inj., Doc. 55 at 1-4.] The court shares his concern that what were initially understood as short-term measures have now stretched into the better part of a year. There is a real danger to civil liberties if courts simply defer to government decisions about what constitutes a public-health emergency and what those governments are allowed to do about it. *Cf. Cnty. of Butler*, 2020 WL 5510690, at *5 to *10.

This helps explain why the court cannot accept Defendants' reading of *Jacobson*. If Defendants' view were correct, and the existence of a public-health emergency created an exemption from normal constitutional review of government action, then courts would have to be much more demanding in reviewing the government's assessment of what constitutes such an emergency. This case may seem fairly easy, as essentially every relevant local, state, national, and international entity has recognized the COVID-19 pandemic to be a public-health crisis, and this court's research has not revealed any other court that has disagreed. But it isn't hard to imagine, if Defendants' approach were the law, any number of things that clever (or even not-so-clever) governments might claim to be a public-health crisis in order to evade effective constitutional scrutiny. Much better, in this court's view, to apply consistent constitutional principles and doctrine.

- 11 -

Traditional constitutional review still will be relatively deferential to the government in most circumstances involving a crisis of this sort. Whether it is deemed an "emergency" or not, responding to a public-health threat is undeniably a compelling government interest.[10] *Jacobson*, 197 U.S. at 25; *Denver Bible Church*, 2020 WL 6128994, at *6, *8. Emergency measures subject to rational-basis review will generally be upheld. *Denver Bible Church*, 2020 WL 6128994, at *8. And for emergency measures subject to heightened scrutiny, courts must take into account the existence of exigencies and scientific uncertainties when considering whether any particular measure is appropriately tailored to accomplish the purpose of protecting public health. *Id.* Thus, although the traditional tiers of constitutional scrutiny are not suspended during an emergency, most emergency measures can pass a heightened level of scrutiny when one applies. *Id.*

"*Jacobson* reflects that, when one weighs competing interests in the balance, the presence of a major public health cris[i]s is a very heavy weight indeed[,] and scientific uncertainties about the best response will afford the state some additional leeway to err on the side of caution." *Bayley's Campground*, 463 F. Supp. 3d at 32; *accord Brooklyn*, 2020 WL 6948354, at *3 (per curiam) ("Members of this Court are not public health experts, and we should respect the judgment of those with special expertise and responsibility in this area."); *S. Bay*, 140 S. Ct. at 1613-14 (Roberts, C.J., concurring) (when state officials "'undertake[] to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad'" (quoting *Marshall v. United States*, 414

---

[10]   Indeed, while Mr. Lawrence contends that the COVID-19 pandemic is not an "emergency," he acknowledges that "State . . . officials have faced tremendous adversity in . . . executing effective . . . statewide policies to protect the general public's health, safety and welfare during this time of crisis." [2d Am. Compl., Doc. 59 at ¶ 10.]

U.S. 417, 427 (1974))); *Edwards v. California*, 314 U.S. 160, 173 (1941) (courts must not second-guess the "wisdom, need, or appropriateness" of state measures taken to protect public health).

## II.  Discussion

Liberally construing the Second Amended Complaint,[11] the court discerns the following federal constitutional claims, brought under 42 U.S.C. § 1983: (A) a right to travel claim; (B) a substantive and procedural due process claim based on deprivation of employment; (C) an equal protection claim; and (D) a takings claim. [*See* 2d Am. Compl., Doc. 59 at ¶¶ 27-53.] Mr. Lawrence also brings claims for (E) alleged violations of his liberty and property rights under the Colorado Constitution; (F) alleged violations of the Colorado Disaster Emergency Act, Colo. Rev. Stat. §§ 24-33.5-701 to 717, and the statute governing the powers and duties of the state health department, Colo. Rev. Stat. § 25-1.5-101; and (7) alleged violation of the Denver Municipal Code, D.R.M.C. § 24-16. [*See id.* at ¶¶ 54-100.]

### A.  Right to Travel

Mr. Lawrence contends that Defendants' public-health orders impermissibly restrict his constitutional right to both interstate and intrastate travel. [2d Am. Compl., Doc. 59 at ¶¶ 27-34.] This claim is based

---

[11]  As noted, the court must construe Mr. Lawrence's pleadings liberally because he is proceeding without an attorney. *Hall*, 935 F.2d at 1110. This means that the court will excuse mistaken references to the wrong constitutional amendment in his complaint. *See Doe v. Univ. of Denver*, 952 F.3d 1182, 1187 n.2 (10th Cir. 2020). It also means that the court will excuse his failure to explicitly indicate that he is bringing claims against Defendants in their official capacities, because his complaint is clear that he seeks both official-capacity injunctive relief and individual-capacity damages. *See, e.g., Trapp v. U.S. Marshals Serv.*, 139 F. App'x 12, 15 (10th Cir. 2005).

on the allegation that he "has not been able to travel to Kansas City as planned, or to travel to North Carolina as planned, or to go to work or to Mass." [*Id.* at ¶ 29.] Mr. Lawrence's allegations, however, are insufficient to state a claim because Defendants' orders do not restrict travel in the manner that he alleges.

### 1. Interstate Travel

The right to interstate travel, in general, "has long been recognized as a basic right under the Constitution." *Abdi v. Wray*, 942 F.3d 1019, 1029 (10th Cir. 2019) (quoting *Dunn v. Blumstein*, 405 U.S. 330, 338 (1972)). The textual source of this right has been the subject of some debate and has not been definitively identified by the Supreme Court. *Id.* (citing *Saenz v. Roe*, 526 U.S. 489, 500-01 (1999)). The Tenth Circuit has analyzed the right under a substantive-due-process framework and found that the right to travel interstate is a fundamental right subject to strict scrutiny. *See id.* at 1026-30. Government action that "directly and substantially" impairs the exercise of that right must be narrowly tailored to achieve a compelling governmental purpose. *Id.* at 1028-29.

If the Defendants' orders actually prohibited Mr. Lawrence and other law-abiding Colorado citizens from leaving the State, the orders would raise serious constitutional concerns. But the currently operative Level Red restrictions clearly do not limit travel outside the State, and even the most restrictive Level Purple on the COVID-19 Dial is at most ambiguous as to such travel.

And when "a serious doubt" is raised about the constitutionality of [a statute or regulation], "it is a cardinal principle" that courts should "first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018). This canon of constitutional avoidance "comes into

play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction." *Id.* If so, the court should adopt the construction that avoids the difficult constitutional question. *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 787 (2000). The court therefore construes the orders at issue here as not preventing individuals from leaving the State.

Under Level Red of Public Health Order 20-36, there is no mandatory restriction on travel. 2d Am. PHO 20-36, *supra* note 7, §§ I(F), II(F) (individuals encouraged but not required to limit travel to Necessary Travel). Nor was there a mandatory travel restriction in the Safer at Home public-health orders that were in effect at the time Mr. Lawrence filed his Second Amended Complaint. [8th Am. PHO 20-28, Doc. 51-2 at § 1(G) (individuals encouraged but not required to limit travel to Necessary Travel).] The Level Red and Safer at Home restrictions, then, do not actually prohibit any travel and cannot be the source of a right to travel claim.

Under the Level Purple set of restrictions in Public Health Order 20-36, however, travel other than "Necessary Travel" is prohibited. 2d Am. PHO 20-36, *supra* note 7, § II(G)(2)(a)(i). Although the Level Purple restrictions are not currently in effect for the City and County of Denver, they may take effect in the near future should Denver's COVID-19 case metrics rise above their current levels. *See Brooklyn*, 2020 WL 6948354, at *3 (matter not moot where restrictions lifted but could be reimposed at any time); *accord Denver Bible Church*, 2020 WL 6128994, at *10 n.17. And the same travel restrictions were in place under the Stay at Home orders that Mr. Lawrence cites in his complaint. [4th Am. PHO 20-24, Doc. 61-2 at § I(F) (travel except Necessary Travel prohibited).] But these travel restrictions can fairly be read to apply only to intrastate travel.

Nowhere do Defendants' orders expressly prohibit individuals from leaving the State or limit the purposes for which they are permitted to do so. And a review of the orders' definition of Necessary Travel indicates that the travel limitations are intended to target local and intrastate travel. Necessary Travel is defined as:

> (1) providing or accessing Necessary Activities, Minimum Basic Operations, Critical Government Functions, and Critical Businesses, and other businesses or industries authorized in Section II of this Order; (2) receiving materials for distance learning, for receiving meals, and any other related services from educational institutions; (3) returning to a place of residence from outside the jurisdiction; (4) travel required by law enforcement or court order; (5) travel to transport children between separate households pursuant to a parenting plan or other agreement governing parental responsibilities; (6) non-residents returning to their place of residence; (7) moving to a new residence, including individuals whose Residence is unsafe due to domestic violence concerns.

2d Am. PHO 20-36, *supra* note 7, § IV(M); *accord* [4th Am. PHO 20-24, Doc. 61-2 at § III(B)]. The phrase "the jurisdiction" in this definition, if read consistently with how that term is used throughout the orders, means the local county or region within the State. *See, e.g.*, 2d Am. PHO 20-36, *supra* note 7, at 2 ("Counties must implement the requirements of the relevant level of the COVID-19 Dial for their jurisdiction . . . ."); *id.* § II(B)(2) ("Counties and regions certified for Level Green may allow any business or activity within their jurisdiction to operate at 50% of their pre-pandemic capacity . . . ."); *accord, e.g.*, [4th Am. PHO 20-24, Doc. 61-2 at § I(E) (local government entities encouraged to provide non-congregate sheltering and support services to people experiencing homelessness "in their jurisdiction"); *id.* § III(A)(3) ("check with the local jurisdiction and follow any requirements for that jurisdiction" when visiting parks to engage in outdoor activity)].

This reading of the orders' travel restrictions as applying only to local and intrastate travel is bolstered by the fact that there is no record of Defendants actually seeking to prevent anyone from leaving the State. Mr. Lawrence has not alleged that, during the period the Stay at Home travel restrictions were in effect, he or anyone else tried and was prevented from leaving the State, was cited or prosecuted for leaving or attempting to leave the State, or was even threatened with citation or prosecution for doing so.

Whether the orders' travel limitations apply to interstate travel is ambiguous at most. Since the restrictions can fairly be read to apply only to travel within the State, the court adopts the construction that avoids the difficult constitutional questions that would otherwise be present. *See Vt. Agency*, 529 U.S. at 787. Under this construction, Defendants' orders do not prohibit or limit Mr. Lawrence's ability to travel outside the State. The Second Amended Complaint therefore does not state a plausible claim for violation of Mr. Lawrence's right to interstate travel.

### 2.   Intrastate Travel

The right to travel within a state is not a recognized fundamental right, and restrictions on intrastate travel and local freedom of movement are subject only to rational-basis review. *McCraw v. City of Okla. City*, 973 F.3d 1057, 1081 (10th Cir. 2020); *see also Abdi*, 942 F.3d at 1028 ("If the right is not fundamental, we apply rational basis review."). Such restrictions "need only be rationally related to a legitimate government purpose." *McCraw*, 973 F.3d at 1081.

Mr. Lawrence's intrastate travel claim is based on the allegation that Defendants' orders prohibit him from traveling to work or Mass. But this is simply incorrect. The Stay at Home orders did, and the COVID-19 Dial orders do, at Level Purple, proscribe travel other than Necessary

Travel. But Necessary Travel includes travel to perform work for authorized businesses (which include restaurants), and travel to access houses of worship. 2d Am. PHO 20-36, *supra* note 7, §§ IV(M), IV(L), IV(C) & App'x A §§ 4-5; *accord* [4th Am. PHO 20-24, Doc. 61-2 at §§ III(B), III(A), III(C)(4)-(5)]. The orders thus do not restrict intrastate travel in the manner Mr. Lawrence alleges, even under the most severe restrictions. To the extent that Mr. Lawrence argues that the orders' occupancy limitations or other restrictions on restaurants and houses of worship make it pointless for him to travel to those locations, and to the extent that he challenges the orders' prohibition on travel other than Necessary Travel, the orders satisfy rational-basis review. Defendants have a legitimate interest in reducing transmission of COVID-19, and limiting individuals' contact with those outside their household by limiting the purposes for which they are permitted to leave their homes is rationally related to that interest. The Second Amended Complaint does not state a plausible claim for violation of Mr. Lawrence's right to intrastate travel.

Because Mr. Lawrence has failed to state a claim for violation of his right to interstate or intrastate travel, his right to travel claim must be dismissed.

### B.  Due Process

The Fourteenth Amendment provides that "No state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Substantive due process ensures that the government will not deprive a person of a protected life, liberty, or property interest for an arbitrary reason, regardless of the procedures used, while procedural due process ensures that the government will not deprive a person of a protected interest without engaging fair procedures

(*i.e.*, some form of notice and opportunity to be heard). *Onyx Props. LLC v. Bd. of Cnty. Comm'rs of Elbert Cty.*, 838 F.3d 1039, 1043 (10th Cir. 2016).

Mr. Lawrence contends that Defendants' public-health orders have deprived him of a Fourteenth Amendment substantive due process right to work at the restaurant where he is employed. [2d Am. Compl., Doc. 59 at ¶¶ 37, 39-40.] He alleges that the restaurant remains closed because it cannot be profitable operating under the restrictions imposed by Defendants' orders. [*Id.* at ¶¶ 21-22.] He further contends that Defendants' public-health orders violate his Fourteenth Amendment right to procedural due process because he was not afforded "a constitutionally adequate hearing to present his case for his businesses to not be shut down." [*Id.* at ¶¶ 38-40.] Mr. Lawrence does not have standing to bring his due process claim.

To begin with, Mr. Lawrence cannot establish the injury component of constitutional standing, which requires an "injury in fact" to "a legally protected interest." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). No doubt the Second Amended Complaint alleges facts sufficient to show that Mr. Lawrence has suffered an injury in the everyday sense of the word—he alleges that he has suffered significant financial harm as a result of his employer's continued closure. [2d Am. Compl., Doc. 59 at ¶¶ 20-22.] But this injury is not to any legally protected interest, because he does not have a protected liberty or property interest in continued employment at the restaurant where he works. The liberty component of the Fourteenth Amendment's Due Process Clause includes a generalized right to choose one's field of private employment, *Guttman v. Khalsa*, 669 F.3d 1101, 1118 (10th Cir. 2012) (citing *Conn v. Gabbert*, 526 U.S. 286, 291-92 (1999)), but this right does not include a right to any specific job, *Wroblewski v. City of Washburn*, 965 F.2d 452, 455 (7th

Cir. 1992) (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 575 (1972)). Nor does the property component of the Due Process Clause include a right to continued employment at a particular job, at least for at-will employees. *Lenz v. Dewey*, 64 F.3d 547, 551 (10th Cir. 1995). In Colorado, there is a presumption of at-will employment, *Cont'l Air Lines, Inc. v. Keenan*, 731 P.2d 708, 711 (Colo. 1987) (en banc), and the Second Amended Complaint alleges no facts to support an inference that Mr. Lawrence might rebut that presumption with respect to his own employment.

Even if Mr. Lawrence's current inability to work constituted an injury to a legally protected liberty or property interest, he does not have legal standing to challenge regulations that are not imposed on him, but on his employer. Whether the problem is considered one of traceability and redressability, and thus constitutional standing, or is merely a prudential standing concern, the State has not outlawed Mr. Lawrence's profession or imposed any particular restrictions on his employment.

When, as here, the plaintiff's asserted injury arises from the government's regulation of someone else, constitutional standing is "'substantially more difficult' to establish." *Lujan*, 504 U.S. at 562. Traceability is not precluded if the challenged regulation produces a "determinative or coercive effect upon the action of someone else," which results in the plaintiff's injury, but there is no traceability if the plaintiff's injury is "the result of the independent action of some third party not before the court." *Bennett v. Spear*, 520 U.S. 154, 167, 169 (1997). When the plaintiff's injury depends on the decisions of third parties and those decisions are "sufficiently uncertain to break the chain of causation between the plaintiff['s] injury and the challenged Government action," traceability is lacking. *Allen v. Wright*, 468 U.S. 737, 759 (1984), *abrogated on other*

*grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014).

That is the case here. Defendants' public-health orders do not prohibit Mr. Lawrence's employer from remaining open during the pandemic, even under the orders' most onerous set of restrictions. *See* 2d Am. PHO 20-36, *supra* note 7, § II(G)(2)(h) & App'x A § 4; *accord* [4th Am. PHO 20-24, Doc. 61-2 at §III(C)(4)]. While Mr. Lawrence's employer has chosen to remain closed because the restaurant is not profitable operating under the restrictions imposed by the orders, that independent decision by his employer breaks the chain of causation between Defendants' orders and Mr. Lawrence's injury. *See Henry v. DeSantis*, 461 F. Supp. 3d 1244, 1252-53 (S.D. Fla. 2020) (plaintiff laid off from food-service job during COVID-19 failed to show traceability because public-health orders did not compel restaurants to close completely or direct them to lay off employees); *Murphy v. Lamont*, No. 3:20-CV-0694 (JCH), 2020 WL 4435167, at *5 (D. Conn. Aug. 3, 2020) (plaintiff whose home-school group chose not to meet during COVID-19 pandemic did not show traceability where executive orders encouraged but did not require private schools to close).

This basic principle may also be considered one of so-called "prudential," rather than constitutional standing. *See, e.g.*, *Rumber v. Dist. of Columbia*, 595 F.3d 1298, 1301 (D.C. Cir. 2010) (employees of businesses operating in shopping center did not have standing to bring claim to prevent city from acquiring shopping center by eminent domain); *Pagan v. Calderon*, 448 F.3d 16, 29-30 (1st Cir. 2006) (where corporation incurs the only direct injury from alleged misconduct, corporation is only proper party to bring suit for that injury; agent or employee lacks standing unless "he alleges that he personally suffered a direct, nonderivative injury"); *Duran v. City of Corpus Christi*, 240 F. App'x 639, 641 (5th

Cir. 2007) ("Courts generally refuse to recognize standing based on economic harm that is merely a consequence of an injury suffered by another party."); *Calderon v. City & Cnty. of Denver*, No. 18-cv-00756-PAB-MEH, 2019 WL 4450199, at *4 to *6 (D. Colo. Sept. 17, 2019) (employee's allegations of lost wages and benefits stemming from defendants' decision not to renew employer's contract insufficient to confer standing); *Jin Fu Zhong v. Sweeny*, No. 08-2204, 2011 WL 1193011, at *10 (E.D. Pa. Mar. 29, 2011) (employee does not have standing to sue when alleged misconduct is directed at employer and employee's loss of income or employment is merely incidental to direct injury inflicted upon employer). While there is some dispute about whether these concepts are better considered as constitutional or prudential standing limitations,[12] either way the court is unable to address Mr. Lawrence's claim.

Because Mr. Lawrence does not have standing to bring his due process claim, this claim must be dismissed.

## C.   Equal Protection

"No state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. A government action that regulates economic activity in a discriminatory manner violates the Equal Protection Clause unless there is a "rational relationship between the disparity of treatment and some legitimate governmental purpose." *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 366-67 (2001) (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)); *see also World*

---

[12]  This court, for what it's worth, is more inclined to think that third-party standing is a constitutional rather than prudential consideration. *See June Med. Servs. L. L. C. v. Russo*, 140 S. Ct. 2103, 2144 (2020) (Thomas, J., dissenting) ("The Court's previous statements on the rule against third-party standing have long suggested that the 'proper place' for that rule is in Article III's case-or-controversy requirement.").

*Gym, Inc. v. Baker*, No. 20-CV-11162-DJC, 2020 WL 4274557, at \*3 (D. Mass. July 24, 2020) ("courts reviewing business closures due to COVID-19 [under the Equal Protection Clause] have consistently applied rational basis review" (collecting cases)).

Mr. Lawrence contends that Defendants' public-health orders violate the Equal Protection Clause because they "draw arbitrary distinctions between businesses based solely on differences that are irrelevant to a legitimate governmental objecti[ve]." [2d Am. Compl., Doc. 59 at ¶¶ 25(a), 42-47.] He alleges that while some businesses "are permitted to go about their business and activities provided certain social distancing practices are employed," restaurants have been subject to protective measures that "were so restrictive that [Defendants'] orders caused [his employer's restaurant] . . . to close down." [*Id.* at ¶ 45.]

The distinctions among different types of businesses in Defendants' public-health orders result in a disparity of treatment between his employer and, for example, houses of worship, which may continue to hold indoor services at 25% capacity under Level Red of the COVID-19 Dial, while his employer must close for indoor dining. *Compare* 2d Am. PHO 20-36, *supra* note 7, § II(F)(2)(j), *with id.* § II(F)(2)(h). Regulatory distinctions among types of businesses are not normally enough to state an equal protection claim. *See, e.g.*, *Heller*, 509 U.S. at 320 (government action that regulates economic activity in discriminatory manner subject to rational-basis review, and "must be upheld against [an] equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification"). Even if they were, for the same reasons discussed above, Mr. Lawrence does not have standing to bring his equal protection claim. As with his due process claim, the restrictions that Mr. Lawrence challenges regulate his employer, not him. Defendants' orders have not directed his employer to

- 23 -

close the restaurant where he works, and his employer has made the independent decision to remain closed. *See Henry*, 461 F. Supp. 3d at 1252-53.

Because Mr. Lawrence does not have standing to bring his equal protection claim, this claim must be dismissed.

### D.  Taking of Property

The Fifth Amendment, as made applicable to the states through the Fourteenth Amendment, prohibits taking private property for public use "without just compensation." U.S. Const. amend. V; *accord Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 194 (1985), *overruled on other grounds by Knick v. Twp. of Scott, Pa.*, 139 S. Ct. 2162 (2019).

Mr. Lawrence contends that Defendants' public-health orders violate the Takings Clause of the Fifth Amendment because the orders "fail to substantially advance a legitimate state interest and they deny the owners of 'non-essential' businesses an economically viable use of their land." [2d Am. Compl., Doc. 59 at ¶¶ 25(b), 48-53.] Perhaps, but because he has not alleged that he is such an owner of an affected business, Mr. Lawrence does not have standing to bring his takings claim either. He has not pleaded injury to a legally protected property interest because he does not have a property right to continued employment at a particular job, and Defendants' public-health orders do not prohibit him from working nor direct his employer to close the restaurant where he works.

Because Mr. Lawrence does not have standing to bring his takings claim, this claim too must be dismissed.

### E.  State and Local Law Claims

A district court may decline to exercise supplemental jurisdiction over a claim if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); *see also Gaston v. Ploeger*, 297 F. App'x 738, 746 (10th Cir. 2008) (district court did not abuse discretion in declining to exercise supplemental jurisdiction over plaintiff's remaining state-law claims; "we have repeatedly recognized that this is the preferred practice"). Because the court must dismiss all of Mr. Lawrence's federal constitutional claims, consistent with the preferred practice in the Tenth Circuit, the court will decline to exercise supplemental jurisdiction over Mr. Lawrence's claims alleging violations of the Colorado Constitution, Colorado statute, and the Denver Municipal Code. These claims will be dismissed without prejudice to Mr. Lawrence's right to bring them in another appropriate court.

### MOTION FOR PRELIMINARY INJUNCTION

The court remains sympathetic to Mr. Lawrence, his employer, and others in their industry. They have borne the brunt of the economic costs of Defendants' public-health measures during this pandemic. Indeed, the financial and mental-health harms that Mr. Lawrence has suffered may be irreparable. Many others in the City, State, country, and throughout the world are experiencing similar hardships, and those hardships should not be discounted when policymakers weigh the costs and benefits of their pandemic response. Despite these real hardships, however, Mr. Lawrence's legal claims cannot be vindicated in federal court and must be dismissed for the reasons explained above. And since issuance of a preliminary injunction is foreclosed when Mr. Lawrence has no likelihood of success on the merits of his claims, *Mrs. Fields*

*Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019), the court must also deny his motion for a preliminary injunction.

## CONCLUSION

It is ORDERED that:

Denver Defendants' Motion to Dismiss Second Amended Complaint [Doc. 61] is GRANTED. All claims asserted in the Second Amended Complaint against Defendants Bob McDonald and Michael Hancock are DISMISSED; and

Colorado's Motion to Dismiss Second Amended Complaint [Doc. 63] is GRANTED. All claims asserted in the Second Amended Complaint against Defendants Jared Polis and Jill Ryan are DISMISSED.

Because the court has dismissed all claims asserted in the Second Amended Complaint, it is FURTHER ORDERED that:

Plaintiff's Motion for Preliminary Injunctive Relief Pursuant to F.R.C.P. 65 [Doc. 46] is DENIED AS MOOT; and

Plaintiff's Emergency Motion for a Declaration of Law [Doc. 75] and Plaintiff's Emergency Motion to Expedite Briefing Schedule for the Plaintiff's Emergency Motion for a Declaration of Law [Doc. 76] are DENIED AS MOOT.

DATED: December 4, 2020          BY THE COURT:

_____

Hon. Daniel D. Domenico